473 So.2d 335 (1985)
Lucien P. SANCHEZ, Sr.
v.
VICCINELLI SHEET METAL & ROOFING COMPANY, INC. and Commercial Union Insurance Company.
No. 84 CA 0657.
Court of Appeal of Louisiana, First Circuit.
June 25, 1985.
Rehearing Denied August 20, 1985.
*336 Alex W. Wall, Sr., Baton Rouge, for plaintiff-appellee Lucien P. Sanchez, Sr.
John W. Perry, Jr., Baton Rouge, for defendant-appellant Viccinelli Sheet Metal & Roofing Co., Inc., and Commercial Union Ins. Co.
Before GROVER L. COVINGTON, C.J., and LOTTINGER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This is a Worker's Compensation suit. The case was tried on July 20, 1983 and taken under advisement. On November 17, 1983 the district court, Honorable Douglas M. Gonzales, presiding, stated in the minutes of the court that "the Court finds that the plaintiff suffered a disability injury during the course and scope of his employment which rendered him permanently and totally disabled and entitling him to compensation at a rate of $163.00 per week." The court rejected plaintiff's request for penalties and attorney's fees. Defendants were assessed for all court costs. The court granted the relief requested by intervenor, Baton Rouge Sheet Metal Workers Welfare Program, reimbursing $20,786.01, representing 80% of the medical expenses incurred by the plaintiff. A judgment was signed January 3, 1984, containing the above provisions and also awarding plaintiff medical expenses of $4,681.25 not paid by intervenor. Defendants timely applied for a new trial and the hearing on the motion was heard on February 3, 1984. At the conclusion of the hearing, the district court granted defendants' alternatively requested relief and amended the first judgment, decreeing that they, "pursuant to ... R.S. 23:1225, are entitled to any credit or offset which may be applicable on the basis or as a result of the plaintiff's receipt of federal social security disability benefits." The amended judgment, signed February 10, 1984, denied the request for new trial in other respects. Defendants suspensively appealed the amended judgment timely. Plaintiff timely answered the appeal, seeking penalties and attorney's fees.

ASSIGNMENTS OF ERROR
Defendants assign as error the district judge's:
1) failing to require plaintiff prove the myocardial infarction occurred during the course and scope of his employment;
2) alternatively, concluding plaintiff carried his burden of proof that the myocardial infarction occurred during the course and scope of his employment;
3) concluding plaintiff was not required to prove "the accidental injury was caused or precipitated by the usual and customary exertions from the work activities performed";
4) allowing plaintiff reimbursement for medical expenses of the coronary by-pass surgery performed in Dallas, Texas.

*337 ISSUES
Defendants state the issues as being whether the district court (1) erroneously concluded plaintiff was not required to prove the myocardial infarction occurred during the course and scope of his employment and/or (2) the myocardial infarction occurred during the course and scope of the employment; (3) failed to require plaintiff bear the burden of proving the myocardial infarction, if it in fact occurred while plaintiff was at work, was caused or precipitated by the usual and customary exertions from his work activities; (4) committed manifest error in concluding plaintiff sustained the myocardial infarction while at work; and (5) improperly awarded medical expenses for the coronary by-pass surgery.

TRIAL
Live testimony was given by plaintiff, a co-worker, defendant employer's shop foreman, insurer's claims representative, and intervenor's administrator. Harold M. Voss, M.D. and John H. Phillips, M.D. testified by deposition. Both physicians' depositions were taken at the behest of defendants. Other items introduced into evidence included medical expense summary sheet, medical and drug bills and hospital records of three hospitals in which plaintiff was confined within six months after he had a myocardial infarction.
The live testimony, except for intervenor's administrator, was, not surprisingly, contradictory in some respects. The main contention of defendants at the trial, and in this court, is that the live testimony by lay persons, deposition testimony of two physicians, and laboratory test results in the Baton Rouge General Hospital record, taken as a whole, establish that plaintiff neither sustained a myocardial infarction while at work nor was the heart attack caused or precipitated by the usual and customary exertions of the employment duties he performed.
Plaintiff alleges that he had the heart attack while at work on Wednesday, May 20, 1981. Defendants contend that the heart attack "occurred over the weekend" before plaintiff returned to work on Monday, May 18, and that the intense pain, which prompted him to ask his employer to transport him from the jobsite in Jackson, Louisiana to Baton Rouge so he could get medical attention, was post-myocardial infarction angina pectoris, i.e., chest pain manifested days after the occurrence of the heart attack.

MEDICAL TESTIMONY AND EVIDENCE
Plaintiff was admitted to Baton Rouge General Hospital (BRGH) on May 20, 1981, at 5:22 p.m., approximately an hour after he drove himself to the office of Dr. Voss, the admitting physician who requested that plaintiff report to the hospital at once. Dr. Voss, an Internal Medicine specialist, had been plaintiff's treating physician since October, 1979 and had a 1979 EKG to compare with the EKG taken at BRGH shortly after plaintiff was admitted. His specialty encompasses the treatment of heart disease but does not include performing surgery or other invasive procedures, e.g., cardiac catheterizations.
Cardiac enzyme studies were started within minutes after plaintiff was admitted to the hospital, the first blood sample having been taken at 5:41 p.m. on May 20. Additional enzyme studies were based on blood samples taken at 4:08 p.m. on May 21 and 2:25 p.m. on May 22. Based on the enzyme studies, Dr. Voss opined that the heart attack occurred "sometime in that three-day period" and "within certainly 48 hours of the time that the [first blood] test was drawn." Dr. Voss dictated into plaintiff's hospital record, on the date of admission, that plaintiff had complained of severe substernal chest pains for "the last three days, which, at first lasted for 10-15 minutes and now, last night and today, have lasted all day long, without let up from any maneuver or procedure." Dr. Voss defended the accuracy of the dictated history, disputed by plaintiff, as being "what I thought I heard at the time." In any event, his opinion was that "somewhere *338 in an interval of time, say, of a week or something" of May 20, 1981, plaintiff "was obviously having pains and he was going to have a heart attack" and that even "if he would have stayed flat on his back in bed, he would have eventually had a heart attack" and equivocated by adding "... of course, the question is whether he would have had one the day he came in or not, I can't answer that."
Dr. Phillips, board certified in the specialties of Internal Medicine and Cardiovascular Diseases, presently Chief of the Cardiovascular Section of Tulane University Medical Center, testifying by deposition for defendants, opined that "it is scientifically clear that this infarction ... occurred on or between 5/16/81, ... a Saturday, up until 5/18/81, ... a Monday." His conclusion was based on "... the analysis of the ... enzymes on 5/20/81, at 5:41 p.m. [which]... indicate that the infarction at that time was in day two or day three more likely day three or in even day four," reinforced by his analysis of May 21 and May 22 enzyme studies, both of which indicated the blood samples were taken "sometime after day four of the infarction." At another point Dr. Phillips stated that the enzyme level on May 22, 1981, "according to the standard and accepted curves would mean that the infarction was approaching day seven or even day ten" but concluded, nevertheless, that the infarction occurred between May 16 and May 18. As to the May 16 to May 18 time span, Dr. Phillips opined that, in fixing the day of the week the heart attack occurred, "probably a portion of Monday ... would have to be included and that the probability is more likely it would have been the middle part of that time."

LAY TESTIMONY
Defendant insurer's claims representative testified that plaintiff gave her a telephone statement in which he admitted having had pain "the night before [May 20, 1981] or a couple of days before then [but] I'm not real sure about [that]." Defendant employer's shop foreman's testimony did not corroborate the claims representative's statement regarding pain before May 20. The shop foreman testified that, regarding the night of May 19, "He didn't specifically say his chest was hurting him. He says he didn't feel good that night before." Plaintiff's helper, an apprentice sheet metal worker, corroborated plaintiff's testimony that the onset of plaintiff's chest pain was between 9:00 and 9:30 a.m., May 20, and that plaintiff had worked without discomfort on May 18, May 19 and until about 9:00 a.m. on May 20.
Mr. Charles Viccinelli, plaintiff's boss, transported him back to Baton Rouge from the Jackson job site. In response to plaintiff's interrogatories propounded April 27, 1982, asking for the names of defendants' prospective witnesses, defendants supplied, inter alia, the name of Charles Viccinelli. However, Mr. Viccinelli did not testify at trial.
The administrator of the Sheet Metal Workers Welfare Program confined his testimony to the medical expenses the Program had paid on behalf of plaintiff when it became apparent that defendants did not intend to pay for any of them.

SCOPE OF REVIEW
In Louisiana, appellate review in civil cases extends to both law and facts. La. Const. of 1974, art. V, § 10(B). Canter v. Koehring Company, 283 So.2d 716, 724, (La.1973) teaches that:
... [T]he reviewing court must give great weight to the factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable ...

Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978) states that "the appellate court should not disturb [the trial judge's or jury's] finding of fact unless it is clearly wrong." It expanded on the thought, in pertinent part, as follows:

*339 ... Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous). (Brackets supplies.)
This case record is made up of testimony taken in open court and depositions of physicians. "In evaluating the testimony adduced in open court, we must follow the rules enunciated in Canter and Arceneaux because the trial judge is in a better position to evaluate the credibility of the witnesses (as compared with an appellate court's access only to a cold record). However, where a trial judge relies on the deposition of a witness, the rules of Canter and Arceneaux do not apply because the trial judge is in no better position to assess credibility than an appellate court. (Citations omitted.) When evaluating depositions, rather than live testimony, we must determine the sufficiency and preponderance of the evidence...." F & S Offshore, Inc. v. Service Machine & Shipbuilding Corporation, 430 So.2d 1167, 1173 (La. App. 1st Cir.1983).
The district judge evaluated the live testimony of witnesses for plaintiff and for defendants and his evaluation will not be disturbed unless it is found to be clearly wrong. Arceneaux v. Domingue, supra. Apparently he resolved the conflicts in testimony in plaintiff's favor. We say this because the district judge did not orally state detailed reasons for judgment in the court's minutes or prepare written reasons for judgment. Nevertheless, defendant did not avail themselves of C.C.P. art. 1917, which requires the court, "when requested to do so by a party" to "give in writing its findings of fact and reasons for judgment, provided the request is made not later than ten days after the signing of the judgment."
In Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200, 1203 (La.App. 1st Cir.1982), writ denied, 429 So.2d 133 (La.1983), we stated the principle of evaluating testimony in the following terms:
... In reaching conclusions, the finder of fact need not accept all of the testimony of any witness as being true or false and may believe and accept a part or parts of a witness' testimony and refuse to accept any part or parts thereof. (Citations omitted.) The opinions of expert witnesses are not binding on the finder of fact and are to be weighed the same as any other evidence.... The fact finder's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong.
Absent detailed findings of fact and conclusions of law, not required because they were not requested by any party, we do not know which parts of the medical deposition testimony the trial judge rejected and what parts he accepted. We surmise, however, the court did not put much stock in the doctors' stated opinions that the myocardial infarction probably occurred during the preceding weekend while plaintiff was not performing his work duties and that post-myocardial infarction pain, or angina pectoris, would be experienced soon after the alleged weekend heart attack.
Dr. Voss testified that he ascertained, during plaintiff's initial visit in 1979, that plaintiff's EKG, done at that time, "was strongly suggestive of an old septal myocardial infarction ... a silent [one] ... because he didn't know he had it." Dr. Voss started plaintiff on a regimen of drugs and provided follow-up care on six additional office visits, the last visit prior to May 20, 1981 being on November 14, 1980; all medication was stopped on March 4, 1980; during the thirteen month interval of October 1979, to November 1980, plaintiff's condition remained stable. (Brackets supplied.)
Dr. Voss conceded there was a relationship between plaintiff's May 1981, heart attack and his employment activities "because obviously ... everything is involved I mean, is related in some way ... so ... any activity is related."

*340 CAUSAL RELATIONSHIP OF MYOCARDIAL INFARCTION TO EMPLOYMENT ACTIVITIES
Defendants argue in their brief that "the symptoms of Mr. Sanchez were obviously manifest prior to any proof of ... any job activities which could possibly have contributed to the manifestation of his problems" and that "the preponderance of the evidence weighs in favor of finding that his symptoms which had developed earlier ... for which there is no proof that any employment activity contributed."
Plaintiff testified that on May 20, 1981, he "was working on a scaffold putting up paneling, screwing the paneling in as Donald [Lege] passed it to" him; the activity was his "regular normal work"; and approximately an hour to an hour and a half into his work-day, plaintiff testified "the pain really struck me ... a sharp pain in my chest ... but I continued on working until twelve o'clock when we went for lunch."
In Roussel v. Colonial Sugars Company, 318 So.2d 37, 39 (La.1975), Marcus, J., for the Court, stated the rule regarding on-the-job heart attacks, as follows:
... [I]t is well settled that benefits are due in compensation cases involving heart conditions resulting in disability or death, whether or not the condition is pre-existing, when the accidental injury [i.e., heart attack] is caused or precipitated by the usual and customary actions, exertions and other factors directly connected with the employment. Hence, it is of no significance that the heart attack could have occurred at another time and place if, in fact, the accidental injury occurred on the job. Further, it is not necessary that the accident resulting in disability or death be caused by extraordinary activities of the employee, or that said activities be the exclusive cause of the accidental injury.... (Brackets supplied.)
In Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626, 633 (La.1982), Calogero, J., for the Court, stated the causation requirement, in part, as follows:
For the heart accident to arise out of or be connected with the employment, the exertion[,] stress or strain, acting upon the pre-existing disease, must be of a degree greater than that generated in every-day non-employment life (e.g., as compared to the more or less sedentary life of the average non-worker).
... [I]f the activities in which the worker with a pre-existing heart disease is engaged, whether for his job usual and customary or not, entail exertion, stress or strain greater than would be involved in everyday non-employment life and he experiences a heart accident, he has made a prima facie showing that the accident arose out of or was connected with, the employment. (Brackets supplied.)
Guidry, supra, at 633, makes it clear that the burden of proving the causal link between the employment and the accident has not been altered. The court reasoned, in part, as follows:
There is no presumption ... that a vascular accident occurring on the job is caused by the employment. There must be a causal link between the employment, or the work, and the accident.... [T]he law imposes upon the plaintiff ... the burden of proving that causal link by a preponderance of the evidence....
This burden of plaintiff's is to show by a preponderance of the evidence that the work effort, stress or strain in reasonable probability contributed in some degree to the heart accident.... (Brackets supplied.)
The Supreme Court, in Hammond v. Fidelity & Casualty Co. of New York, 419 So.2d 829, 831 (La.1982), after stating the above burden of proof requirement, elaborated, in pertinent part, as follows:
... [I]t is not necessary for the experts to determine the exact cause of the disability in order for the employee to recover. The complaint need show only by a preponderance of the evidence that the work accident caused the disability.... "Furthermore, medical testimony `must be weighed in the light of other *341 credible evidence of a nonmedical character, such as a sequence of symptoms or events in order to judicially determine probability' ..."...
A plaintiff-employee's disability will be presumed to have resulted from an employment accident if before the accident the plaintiff-employee was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves, provided that the evidence shows that there is a reasonable possibility of causal connection between the accident and the disabling condition.... This presumption is not a conclusive one; rather, it compels the defendant to come forward with sufficient contrary evidence to rebut it.... (Brackets supplied.)
Common sense compels us to hold that the work activities of a sheet metal worker, as described by plaintiff and his apprentice helper, entail exertion, stress, or strain greater than experienced by the sedentary non-worker.
In reversing the lower courts' decisions denying the employee compensation benefits, the Supreme Court, in Hammond, supra, at 832-833, observed, in part, as follows:
... The lower courts believed that the medical evidence was sufficient to deny compensation. They failed to distinguish the "medical" meaning of cause from the "legal" meaning of cause.... When courts and lawyers speak of cause they are concerned with the question of whether the particular incident in question contributed to the plaintiff's disability by making manifest symptoms previously unnoticed. "Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the court, based on all the credible evidence." Haughton v. Fireman's Fund American Insurance Companies, 355 So.2d 927, 928 (La.1978). (Emphasis supplied.)
The district court's evaluation of the live testimony will not be disturbed because it was not clearly erroneous. The court's finding that plaintiff was entitled to compensation was made approximately four months after taking the matter under advisement at the conclusion of the trial. During that time the trial judge evaluated the two physicians' depositions, which, for the most part, fixed the time of plaintiff's heart attack at two to three days before Wednesday, May 20, 1981. Both doctors' opinions were based on enzyme studies and comparisons to charts and graphs which the doctors believed to be accurate. Both doctors opined that plaintiff's work activities were anything except sedentary in nature.
Neither the district court nor appellate courts are bound by the opinions of expert witnesses stated in deposition testimony or live testimony. Holmes, supra, at 1203. "The fact finder's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong." Holmes, supra, at 1203. We have evaluated the two physicians' depositions and conclude the opinions stated in them do not constitute "sufficient contrary evidence to rebut" plaintiff's "prima facie showing that the accident arose out of, or was connected with, the employment." Guidry, supra, at 633; Hammond, supra, at 831. Therefore, the trial judge's evaluation of the medical and lay evidence was not clearly erroneous. We agree that plaintiff established his entitlement to worker's compensation benefits by a preponderance of the evidence.

ADVERSE INFERENCE
Defendants attach great significance to statements attributed to plaintiff, namely that the onset of chest pains was three days before the crescendo angina pectoris which prompted him to seek medical attention during the middle of the afternoon of May 20. Whether such statements were made at all, and, if so, to whom, was disposed of by the trial judge in evaluating the credibility of the lay witnesses who testified at trial. As stated earlier, we hold that the trial judge's evaluation of testimony, *342 both live and deposition, was not clearly erroneous and will not be disturbed.
We note, however, that Charles Viccinelli, plaintiff's boss, who transported him from Jackson to Baton Rouge, a thirty to forty-five minute drive, did not testify at trial. In their May 28, 1982 response to plaintiff's interrogatories, defendants stated that Charles Viccinelli and/or seven other specified persons "may be called as a witness for the defense at the trial of this case, although no decision has as of yet been made." Plaintiff was able to talk to Dr. Voss when he drove himself there shortly after 4:00 p.m. It is difficult for us to believe that no verbal exchange took place between plaintiff and Mr. Viccinelli during the trip from Jackson to the sheet metal shop in Baton Rouge. What was said by plaintiff during the trip could have been useful to the trier of fact in resolving the credibility issue. Mr. Viccinelli's failure to testify gives rise to the inference or presumption that his testimony would have been adverse to defendants' cause. Daigre v. Department of Transportation and Development, 461 So.2d 609, 612 (La.App. 1st Cir.1984).

PENALTIES AND ATTORNEY'S FEES
Plaintiff seeks reversal of that portion of the trial court judgment rejecting his demands for penalties and attorney's fees based on defendants' alleged capricious and arbitrary refusal to pay worker's compensation benefits and medical expenses.
Defendants seriously questioned the causal link between the employment and plaintiff's heart attack, based initially on the history Dr. Voss dictated into the hospital record on the day plaintiff was admitted to the hospital. Dr. Voss' deposition and Dr. Phillips' deposition, especially the enzyme studies portions of each, doubtlessly reinforced defendants' belief that compensation was not owed. We believe, and hold, that defendants were acting in good faith when they insisted at all stages of this litigation, including this appeal, that plaintiff failed to prove entitlement to worker's compensation benefits. The serious issue of causation between employment and accident was resolved in the lower court and in this court against defendants. Based on the record as a whole, we do not find that defendants were arbitrary and capricious in their refusal to pay compensation benefits. Accordingly, penalties and attorney's fees are denied.

OFFSET FOR SOCIAL SECURITY DISABILITY BENEFITS
At trial plaintiff testified he began receiving Social Security Disability Benefits of $642.00 per month in November, 1982. At the time of trial plaintiff was fifty-five years old. Defendants' brief states "unfortunately, in pre-trial discovery, specifically [in] ... Mr. Sanchez's deposition" on February 9, 1982, plaintiff stated he had applied for disability benefits but the Social Security Administration had denied his claim and he had not appealed the denial of benefits. The deposition referred to and excerpted by defendants was not made a part of the record of appeal. Defendants opted not to introduce the deposition in evidence when the trial judge refused to allow its introduction solely for impeachment purposes. Therefore, defendants' alluding to the deposition, not included in the record, was improper, being in violation of Rule 2-12.4 of the Uniform Rules of Louisiana Courts of Appeal.
Nevertheless, defendants are entitled to have the amount of off-set determined, as provided for by R.S. 23:1225. The off-set takes effect from the date defendants judicially demanded it. Lofton v. Louisiana Pacific Corp., 423 So.2d 1255, 1259 (La.App. 3rd Cir.1982). Defendants first requested off-set in their Application for New Trial filed January 9, 1984. Near the conclusion of plaintiff's testimony on July 20, 1983, defendants' counsel, responding to the court's question whether defendants "are going to ask for a claim for credits", responded "I'm sure I will, if benefits are awarded." Counsel's response does not, in our view, constitute a request for off-set.
*343 We hold, as did the Third Circuit Court of Appeal in Lofton, supra, at 1259, that:
... [T]he intent of R.S. 23:1225 was to give the compensation carrier, rather than the federal government, the benefit of the ceiling placed on both programs by the coordination of benefits. The statute did not effect a reduction below that which the federal offset provisions provided for....
We adopt the formula stated in Lofton, supra, as the method of calculating the off-set and we remand this matter to the district court for the purpose of making that calculation consistent with the views herein expressed.

CORONARY BY-PASS SURGERY EXPENSES
Defendants make the novel argument that expenses of the by-pass surgery performed in Dallas, Texas should not be allowed because "no physician actually referred him to Dallas for the treatment, but rather it was something done on his own initiative ... [and] it would be unjust for appellants to be cast for responsibility vis a vis this unnecessary and gratuitous treatment." (Brackets supplied.) Not surprisingly, no case law is cited as authority for their proposition because we can find none either.
Plaintiff's uncontradicted testimony is that he sought a second opinion from several Baton Rouge doctors after the cardiac catheterization done at Our Lady of the Lake Regional Medical Center (OLOL) by Dr. T.R. Kilpatrick, Jr., cardiologist, resulted in the conclusion that surgery would not help plaintiff; however, the additional physicians declined to give an opinion. Dr. Voss, plaintiff's treating physician, was pleased with the results of plaintiff's by-pass surgery. It is not necessary, as a prerequisite for recovering medical expenses, that the treatment was effective. Hayes v. Commercial Union Assurance Company, 459 So.2d 1245, 1254 (La.App. 1st Cir.1984), writ denied 462 So.2d 1247 (La.1985). We hold that expenses of medical treatment by a physician and other health care providers, secured by the patient on his own initiative, rather than by another physician's referral, is, nevertheless, a covered expense to which the injured party is entitled to reimbursement.
The judgment of the court below is affirmed; however, the matter is remanded to expeditiously determine the amount of off-set to which defendants are entitled, consistent with the views herein expressed. Defendants are cast for all costs of court, both in the district court and on appeal, and for the costs to be incurred at the hearing on remand. C.C.P. art. 2164.
AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.
GROVER L. COVINGTON, Chief Judge, dissenting.
I respectfully dissent from the majority opinion.
Defendants, Viccinelli Sheet Metal & Roofing Company, Inc. and Commercial Union Insurance Company, appeal from a judgment awarding plaintiff, Lucien P. Sanchez, Sr., workers' compensation benefits for permanent and total disability following a myocardial infarction. Plaintiff has answered the appeal, requesting that penalties and attorney fees be awarded. Because I find that plaintiff failed to sustain his burden of proof that his heart attack or myocardial infarction was work-related, I would reverse the judgment of the trial court.
Although myocardial infarctions have been found to satisfy the statutory requirements of personal injury by accident, Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La.1982), the law imposes upon the plaintiff in workers' compensation cases, as it does in other civil cases, the burden of proving by a preponderance of the evidence that the work effort, stress or strain in reasonable probability contributed in some degree to the myocardial infarction (heart attack).
Plaintiff, a sheet metal worker, was employed for a number of years by Viccinelli. On Wednesday, May 20, 1981, while on a *344 job site in Jackson, Louisiana, he complained of chest pains, and some hours later, left to see his doctor. He was hospitalized the same day, and diagnosed as having suffered a myocardial infarction. In October of 1981, plaintiff underwent bypass surgery in Dallas, Texas, without the concurrence of his treating physician and a consultant to whom his doctor had referred him.
Plaintiff testified at trial that he felt normal on the morning in question until about 10:00 a.m., when he first experienced sharp chest pains. Despite this pain, he continued working until lunch time. Then he lay down in the back of a truck and took a nap. He was awakened at about 12:30 by a co-worker. He resumed working, and worked until approximately 2:30 p.m., at which time he left the job to seek medical attention. He testified further that he had not ever complained to his co-workers or anyone else of any previous chest pains, or of any pain prior to 10:00 a.m. on that date.
The only other witness who testified for the plaintiff was his co-worker, Donald Lege. Lege said that on that day plaintiff had been "working slow. He wasn't to his full capacity at working like any other day." He further stated that he overheard plaintiff telling another co-worker, Stephen Desselle, about experiencing chest pains the night before.
Desselle testified that on May 20 plaintiff told him (Desselle) that he was not feeling well, specifically that his chest was hurting, and that he should not have come to work that morning because he had felt ill the night before.
Regarding the question of when plaintiff's myocardial infarction occurred, there is the medical testimony taken by deposition of plaintiff's treating physician, Dr. Harold Voss, and the plaintiff's hospital records which contradict plaintiff's testimony in significant respects.
Dr. Voss, who is a Board-certified physician in internal medicine, was questioned about the history he had taken from Sanchez on May 20 in connection with plaintiff's admission to the hospital, which reads in pertinent part as follows:
For the last three days, the patient reports having severe substernal chest pains, which, at first, lasted for 10-15 minutes and now, last night and today, have lasted all day long, without let up from any maneuver or procedure.
The patient reports that he has not had any palpitations, ectopic beats, orghopnea, paroxysmal nocturnal dyspnea, edema, cyanosis. The patient does not feel well, but has no cold, clammy sweaty or syncope feelings. (Emphasis added.)
Dr. Voss further testified that on the date of plaintiff's admission to the hospital, and for two days subsequent, plaintiff underwent a specific diagnostic test, a cardiac enzyme study, which revealed that plaintiff had had a myocardial infarction, but that the changes and elevation of one of the enzyme values indicated that the myocardial infarction had occurred at least, 24 hours before the date of admission, and of the other enzyme, within the last 48 hours of that time. This opinion of Dr. Voss is consistent with the history taken at that time.
Dr. Voss's opinion regarding the results of the cardiac enzyme study is supported by that of Dr. John Phillips, Surgery Professor of Medicine and Chief of the Cardiovascular Section of Tulane Medical Center, who deposed that based on Sanchez's records and Dr. Voss's deposition, he was also of the opinion that Sanchez experienced his heart attack prior to the May 20 date. Dr. Phillips explained the cardiac enzyme studies as follows:
The heart muscle contains a number of enzymes; and, when that muscle is injured and is in the process of proceeding to death, those enzymes are released into the blood where they can be measured. There are a number of those enzymes. The most important enzyme is this particular analysis would be the LDH enzyme and the CPK enzymes particularly the LDH cardio-isoenzymes and the CPK cardio-isoenzymes.
*345 Testifying in detail about the results of the cardiac enzyme tests, Dr. Phillips broke down each day's tests into two parts, reflecting each of the two enzymes, as follows:

May 20
1. LDH enzyme analysis indicated that infarction was in its third to fourth day. CPK enzyme analysis indicated that infarction "was in day two or day three more likely day three or in even day four."

May 21
1. LDH enzyme analysis indicated that infarction was in day four or five.
2. CPK enzyme analysis indicated that infarction was "sometime after day four at that time."

May 22
1. LDH enzyme analysis indicated that infarction "was approaching day seven or even day ten."
2. CPK enzyme analysis indicated that this was "sometime after day four of the infarction."
Dr. Phillips concluded:
Based on that, it is scientifically clear that this infarction and/or major heart damage to the heart occurred on or between 5/16/81, which I would say was a Saturday, up until 5/18/81, which was a Monday.
Regarding the pains experienced by plaintiff, which he claimed began on May 20, both doctors said that these were angina pectoris, and that any disability resulting from the myocardial infarction occurred at the time of the infarction, rather than the post-infarction angina.
Dr. Voss pointed out that the plaintiff's previous history included a "silent" myocardial infarction i.e. an asymptomatic one in 1979, which plaintiff did not know he had suffered until later tests revealed the condition.
The thrust of this medical testimony, is that the myocardial infarction occurred prior to Wednesday, May 20, 1981, and was not work-related. I find from the evidence that the plaintiff has failed to establish by a preponderance of the evidence that he has sustained a work-related injury. Chatelain v. American Can Company, 344 So.2d 1180 (La.App. 4 Cir.1977).
Accordingly, I would hold that plaintiff has not met his burden of proof, and that the judgment of the trial court should be reversed.