493 So.2d 150 (1986)
Louise HEBERT
v.
FIRST GUARANTY BANK, et al.
No. CA 85 0614.
Court of Appeal of Louisiana, First Circuit.
June 24, 1986.
Dissenting Opinion August 12, 1986.
*151 Hobart O. Pardue, Jr., Springfield, for Louise Hebert.
Robert Rooth, New Orleans, for First Guar. Bank, et al.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This suit for damages arose out of action taken by defendant bank's officer, Raymond Schafer, a co-defendant, in "picking up" Louise Hebert's 1977 Lincoln Continental automobile in Jackson, Mississippi on May 7, 1981 without benefit of a writ of seizure and without obtaining a release of the vehicle by Mrs. Hebert.
Mrs. Hebert purchased the vehicle from an automobile dealer in Ponchatoula on January 30, 1981 for $6,350.00; she received a trade-in allowance of $1,850.00 for her old car and made a cash payment of $400.00. She borrowed the remainder of the purchase price, plus sales tax and transfer fees, from First Guaranty Bank, hereafter First Guaranty. When the dealer's attempt to re-title the traded-in vehicle failed because Mrs. Hebert had not obtained a Louisiana title, the dealer informed First Guaranty that some additional sales tax would have to be collected from Mrs. Hebert in order to straighten out the title problem. Defendant Schafer and two other bank employees tried, without success, to communicate with Mrs. Hebert concerning the problem by calling the telephone number she gave First Guaranty, calling an attorney who was handling some litigation she initiated against her children and by going to the residence listed on the loan application and where she had resided since her husband died in August, 1980.
On May 7, 1981 an employee of First Guaranty received an anonymous telephone call in which the caller informed the employee the car on which First Guaranty held a security interest was at a specified address in Jackson, Mississippi. That same day defendant Schafer and Mr. McCormick, a bank employee, went to that address and found the car and observed that it had sustained physical damage. Mrs. Hebert saw Mr. Schafer as he knocked on the door of a residence adjacent to the car and went to him. Mrs. Hebert, Mr. Schafer and Mr. McCormick went into the house and Mr. Shafer explained the sales tax and titling problem and also informed Mrs. Hebert there was no insurance in force on the car and that she had removed the vehicle from Tangipahoa Parish without permission, a condition stated in First Guaranty's unperfected chattel mortgage. While the testimony of Mrs. Hebert and that of Messrs. Schafer and McCormick vastly differ regarding what motivated her to give the ignition key to Mr. Schafer, it is undisputed that she gave the key to him and he drove the car to Ponchatoula that afternoon, departing Jackson after 5:00 p.m.
Mrs. Hebert's trial and appeal counsel wrote a letter, dated May 18, 1981, to First Guaranty, directed to Mr. Schafer's attention, in which he stated that "you seized her vehicle in the State of Mississippi and *152 took it without authorization" and that Mr. Schafer or his attorney should contact him "in an attempt to settle this dispute over this illegal seizure." Mr. Schafer responded to the letter by a telephone call to the attorney whom he informed that Mrs. Hebert had asked him to drive the car to Ponchatoula and that she would be there the next day to straighten out the title and other problems. In August Mrs. Hebert went to Mr. Schafer's home, where the car had been removed after having been parked in First Guaranty's parking lot a disputed period of time, and removed clothing and other personal property from the trunk of the car. No payments were made on the car loan after Mr. Schafer "picked it up."
On September 15, 1981 First Guaranty filed its petition for executory process to enforce its security interest. The petition alleged that Mrs. Hebert was "a resident of the County of Hinds, City of Jackson, State of Mississippi" and prayed that a curator ad hoc be appointed to represent "the absentee defendant." A curator was appointed and he placed a "whereabouts" notice in The Tangi Talk, a newspaper published in Amite. Neither First Guaranty nor its employees or its attorney furnished any Jackson address at which Mrs. Hebert might receive mail. The car was sold in due course, at a Sheriff's sale, to First Guaranty for $500.00. Mr. Pardue, who wrote the May 18, 1981 letter to Mr. Schafer, was not contacted by anyone from First Guaranty before the suit for executory process was filed or before the car was sold at public auction. The curator received no response to his "whereabouts" advertisement which ran twice.
On May 6, 1982, Mrs. Hebert filed this suit in which she sought damages totaling $301,500.00 for loss of vehicle, loss of use of vehicle, embarrassment, humiliation, mental anguish, medical expense, physical pain and suffering, permanent scarring, and permanent disability. At trial the only items of damage for which she offered any proof were embarrassment, humiliation, mental anguish, and loss of the vehicle.
After a two day bench trial the trial court took the matter under advisement and subsequently awarded Mrs. Hebert $2,634.08, representing the value of the car she traded in when she bought the subject vehicle, plus the cash down payment and the installment notes paid on the car loan. Additionally, the court awarded $15,000.00 "for the mental anguish and distress she suffered as a result of illegal seizure."
Defendants suspensively appealed the December 21, 1984 judgment.

ASSIGNMENTS OF ERROR
Defendants assign as errors the trial court's:
1. Denying defendants' motion to disqualify Mrs. Hebert's attorney "due to his importance as a witness at trial";
2. Admitting into evidence and considering the depositions of Messrs. Virgil Hutchinson and Alvin Dinger, Jr., without first having required Mrs. Hebert prove their unavailability for testimony at trial;
3. Finding that Mrs. Hebert's "relinquishment of her automobile to First Guaranty and its employees was involuntary";
4. Finding that First Guaranty "improperly withheld information regarding the plaintiff's location and her representation by" trial and appeal counsel "from the curator ad hoc appointed" in the executory process suit;
5. Abusing its discretion in its award of damages to the plaintiff;
6. Failing to "compensate or set off against the trial court's judgment in favor of the plaintiff First Guaranty's judgment on its reconventional demand on an unrelated promissory note.

MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL
Defendants assert that The Code of Professional Responsibility, notably DR 5-101(B) and DR 5-102, are authority for their proposition that plaintiff's trial counsel should have been disqualified by the trial court because "his testimony was *153 needed at trial by both his client and by the defendants on two related subjects," one of which was "his conversations with Mr. Schafer after the alleged seizure" and the other relative to "the date when he began representing Mrs. Hebert and the scope of such representation." We have determined, from the record as a whole, that trial counsel's role was not compromised because of the conversations he had with First Guaranty's officer and find as a fact that his representation began at least on the date he wrote to First Guaranty regarding the "picking up" of the vehicle in Mississippi. Thus, we find no merit to defendants' first assignment of error.

HUTCHINSON AND DINGER DEPOSITIONS
Defendants argue that plaintiff did not prove either Mr. Hutchinson or Mr. Dinger were unavailable for testimony at trial and, under La.C.C.P. art. 1450, their depositions were improperly admitted into evidence pursuant to Mrs. Hebert's offer. The depositions were taken at the behest of defendants and the deposition subpoenae were served on both men who responded to those subpoenas. In response to defendants' interrogatory that plaintiff "identify every witness you will call or may call to testify at the trial of this matter," plaintiff supplied the names of Messrs. Hutchinson and Dinger and four other persons. The record does not contain a formal pre-trial order and we are not aware of any formal pre-trial procedure in existence in the district court of Tangipahoa Parish at the time this litigation was running its course.
The depositions were taken on September 20, 1984 at the Livingston Parish Courthouse and the trial was held on September 25 and 26, 1984. Defendants' counsel argues that
... These two individuals' deposition testimony was particularly incredible, for they claimed to have eavesdropped, along with several others, on the conversation between Mr. Schafer, Mr. McCormick, and Mrs. Hebert, without their presence being noticed.... In short, their unbelievable testimony coupled with the defendant's (sic) difficulty in serving them with deposition subpoenae and Mrs. Hebert's use of the depositions as trial testimony smacks of contrivance and complicity.
Defendants contend that the trial court improperly admitted into evidence the two depositions, arguing that
... Because Mrs. Hebert had indicated that these two individuals would be testifying at trial and because Mr. Pardue [trial counsel] never indicated that these witnesses would be unavailable, [defendants'] undersigned counsel took the depositions for discovery purposes only.... [He] did not notice their depositions for the perpetuation of evidence. (See attached notice of deposition.)
(Emphasis and bracketing are ours.)
Our examination of the record reveals that defendants' notice of depositions does not state on its face the purpose or purposes for which the depositions were to be taken. Additionally, we have noted earlier that defendants' interrogatory requesting the identities of potential witnesses did not request plaintiff to specify which of the named persons would be "may call" witnesses and which others would be "will call" witnesses. The interrogatory simply asked plaintiff to "identify every witness you will call or may call to testify at the trial ..."
Each deposition was preceded with the language that counsel for defendants and plaintiff stipulated that the deposition "is hereby being taken for all purposes, under Article 1421 et seq. of the Louisiana Code of Civil Procedure, in accordance with law, pursuant to notice, ..." The joint stipulations of counsel at the depositions, in combination with the notice of depositions, convinces us that no limitations were placed on the use of the deposition testimony and defendants' argument that such testimony was for discovery purposes only is self-serving and totally without merit. We do not accept defendants' argument that Town of Church Point v. Carriere, 463 So.2d 986 (La.App. 3d Cir.1985), *154 "shows clearly that the depositions [of Hutchinson and Dinger] should have been excluded."
In Carriere, Judge King, dissenting in part and concurring in part, dissented "from the majority holding that a deposition of a witness is admissible in evidence at the time of a trial on the merits in lieu of the presence of the witness, because of an ambiguous stipulation made at the time of the taking of the deposition, without the requirements of LSA-C.C.P. Art. 1450 being first met." 463 So.2d at 992. Judge King concurred in the result reached by the majority "even though the deposition of the appraiser was improperly admitted into evidence" because "the result would be the same" without the deposition, thus the "improper admission" was, in his view, "only harmless error."
Judge Stoker, for the majority in Carriere, observed that the attorneys stipulated at the deposition that "this deposition is being taken for all purposes" and, in the majority's opinion, "[t]his stipulation is ambiguous," reasoning that:
... Without the introductory clause of the stipulation the "all purposes" provision would seem to permit use of the deposition at trial, saving, of course, any objections from an evidentiary standpoint which would have been valid had the testimony been taken in court as part of the trial.
. . . . .
... [I]f the depositions were ruled inadmissible, the result would be the same.... Under the circumstances the Town proved its case even without the testimony of Kirney Thibodeaux; therefore, if admission of his deposition was error, it was harmless error.
463 So.2d at 989-990. (Brackets supplied.)

PROOF
In the present case, the trial court had enough live testimony to determine that Mrs. Hebert had proved her case by the required preponderance of evidence, without utilizing any of the deposition testimony. As our Supreme Court reasoned in Canter v. Koehring Company, 283 So.2d 716 (La.1973):
... [T]he reviewing court must give great weight to the factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable ...
283 So.2d at 724. (Emphasis supplied.)
We observed in Sanchez v. Viccinelli, 473 So.2d 335 (La.App. 1st Cir.1985) that "[t]he district judge evaluated the live testimony of witnesses for plaintiff and for defendants and his evaluation will not be disturbed unless it is found to be clearly wrong," citing Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Our scrutiny of the record fails to reveal that the trial judge committed manifest error in finding that defendants committed the tort known at common law as wrongful conversion of property, an intentional tort.

COMPARATIVE NEGLIGENCE
Defendants argue that Mrs. Hebert "proved no damages" and, in the alternative, that the damages awarded her were excessive for two reasons, the first being "her testimony of her anguish did not support the award" and the second being the trial court's failing to reduce the award "by that amount for which Mrs. Hebert was responsible due to her own comparative negligence." Applying the rationale of Arceneaux v. Domingue and Canter v. Koehring, we find no manifest error in the trial court's finding that Mrs. Hebert established she experienced mental pain, anguish, humiliation, and embarrassment because of the wrongful conversion of her property and that there was a causal connection between the wrong done and the injuries she sustained.
Defendants cite no authority for their proposition that Mrs. Hebert's damages *155 should be reduced because she was allegedly comparatively negligent.
Restatement of Torts (2nd), § 481 (1977), and comments thereto, states, in pertinent part, as follows:
§ 481
The plaintiff's contributory negligence does not bar recovery against a defendant for a harm caused by conduct of the defendant which is wrongful because it is intended to cause harm to some legally protected interest of the plaintiff or a third person.

Comment B:
This section states that the plaintiff is not barred from a recovery against an intentional wrongdoer by his contributory negligence ...
Prosser & Keaton on Torts (5th Ed., 1984), § 65, states the inapplicability of contributory negligence to an intentional tort as follows:
The ordinary contributory negligence of the plaintiff is to be set over against the ordinary negligence of the defendant, to bar the action, but where the defendant's conduct is actually intended to inflict harm upon the plaintiff, there is a difference, not merely in degree, but in the kind of fault; and the defense has never been extended to such intentional torts. Thus, it is no defense to assault or battery. The same is true of that aggravated form of negligence, approaching intent, which has been characterized variously as "willful," "wanton" or "reckless" as to which all courts have held that ordinary negligence on the part of the plaintiff will not bar recovery. Such conduct differs from negligence not only in degree but in kind, and in the social condemnation attached to it. At page 462. (Emphasis supplied.)
Our research fails to reveal any Louisiana case law applying either contributory negligence or comparative fault in the context of an intentional tort setting. The case law of most jurisdictions does not allow either contributory negligence or comparative fault as a defense to an intentional tort. See Woods, Comparative Fault, infra. Wrongful conversion is an intentional tort and recovery therefor is not barred by contributory negligence. Comparative negligence, which has taken the place of contributory negligence in Louisiana, is likewise not applicable to reduce the damages to which the victim of an intentional tort is entitled. Woods, H., Comparative Fault, §§ 7.1 and 7.2. (The Lawyers Co-Operative Publishing Co., 1978).
Defendants' third and fifth assignments of error, therefore, have no merit.

INFORMATION WITHHELD/PLAINTIFF'S WHEREABOUTS
The trial court found as a fact that
On September 8, 1981 First Guaranty Bank filed an executory process suit against Louise M. Hebert, asking that a curator be appointed because the whereabouts of Mrs. Hebert were unknown. The bank [neither] made [an] effort to give the curator any information as to the whereabouts of Mrs. Hebert nor did [it] ... notify the curator that Mrs. Hebert had been represented by Mr. Hobart Pardue, Jr. despite the fact that the bank had received a letter from Mr. Pardue on May 18, 1981 indicating that he did represent Mrs. Hebert.
(Brackets supplied.)
Based on the record as a whole, we are unable to say that the trial judge was manifestly erroneous in finding that First Guaranty and its employees, including defendant Schafer, improperly withheld information regarding Mrs. Hebert's whereabouts and her representation by Mr. Pardue. Accordingly, the fourth assignment of error is without merit.

OFFSET FOR JUDGMENT ON RECONVENTIONAL DEMAND
On December 22, 1983 First Guaranty filed a pleading styled "Supplemental, Amending, and Superseding Petition and Reconventional Demand," virtually all of which set out its reconventional demand *156 seeking payment of a promissory note made by Mrs. Hebert on December 31, 1980, "made payable to the order of the bank ... on February 30, (sic) 1981," in the original amount of $1,049.64. The reconventional demand was served by mail on Mr. Pardue, Mrs. Hebert's counsel in the main demand. Judgment by default was read, rendered, and signed on February 23, 1984 by District Judge Gordon E. Causey.
First Guaranty argues that it was error for the trial court not to offset its judgment which had a value of $1,926.78 on December 21, 1984, the date of the judgment in favor of Mrs. Hebert in the amount of $17,634.08, with legal interest from date of judicial demand.
The code articles governing compensation or offset, in force when both judgments were rendered, were La.C.C. arts. 2209 and 2210. Article 2209 stated, in pertinent part, as follows:
Compensation takes place only between two debts, having equally for their object a sum of money, or a certain quantity of consumable things of one and the same kind, and which are equally liquidated and demandable.
Former Article 2209 has been modified, expanded, and redesignated as Article 1893 by Act 331 of 1984, effective January 1, 1985. Article 1893 states, in pertinent part, that:
Compensation takes place by operation of law when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due.
In such a case, compensation extinguishes both obligations to the extent of the lesser amount.
Article 2210, redesignated as Article 1894 by Act 331 of 1984, provided, in part, that "Compensation takes place, whatever be the causes of either of the debts, except in case: 1. Of a demand of restitution of a thing of which the owner has been unjustly deprived."
In Tolbird v. Cooper, 243 La. 306, 143 So.2d 80 (1962), the Supreme Court, per Hawthorne, J., treated the subject of compensation, in pertinent part, as follows:
That there are legal compensation and compensation by reconvention, or judicial compensation, has been expressly recognized in at least one case in Louisiana,... In a case then where there is a main demand and a demand in reconvention and the judge finds for each party and renders judgment for the difference between the amounts found to be owed, he thus effects compensationa judicial compensationwhereby two payments are avoided.
The maxim "A party despoiled ought first of all to be restored" is as applicable to this kind of compensation for obvious reasons as it is to the legal compensation in the Code. The motive of equity is equally evident here. Where the plunderer sets up his opposing claim by way of reconvention, here also nothing ought to hinder the one plundered from being first of all restored. Here also it primes all other considerations. ... There should be no balancing of the amounts found to be owed to avoid two payments. The party despoiled is entitled to be restored above all, and in this case two payments are necessary.

143 So.2d at 85. (Emphasis supplied.)
In Neff v. Ford Motor Credit Co., 347 So.2d 1228 (La.App. 1st Cir.1977), this Court rejected Ford's contention that the trial court erred when it "failed to consider Ford's claim raised in its supplemental answer that it is entitled to a `set-off' for the remaining unpaid balance due on the note... at the time the executory proceedings were instituted ..." Judge Cole (now Justice Cole), for the Court, reasoned, in part, as follows:
... Ford's claim for a "set-off," or compensation raised by affirmative answer is in reality a reconventional demand for a deficiency judgment. See La.-C.C.arts. 2207-2216; La.-C.C.P. arts. 2771, 2772. However, Ford is not entitled to a deficiency judgment because of *157 its failure to follow the formalities of service of the notice of seizure upon the plaintiff as required by the provisions of executory proceedings....
Additionally, the debt which appellant [Ford] seeks to interpose against the damages awarded is not compensable. La.-C.C. art. 2210(1) ...
The present suit is for the restitution, or value, of a thing of which Ms. Neff has been unjustly deprived and falls within the exception provided for by this provision of law [La.-C.C. art. 2210(1)]. It is well settled that a set-off or compensation is not allowable in a suit for tortious or wrongful conversion. See Hitt v. Herndon, 116 La. 497, 117 So. 568 (1928); ...; Tolbird v. Cooper, [supra].
347 So.2d at 1232. (Brackets and emphasis supplied.)
The present case is one of tortious or wrongful conversion for which defendants were cast in judgment, not only for the value of the automobile used as a trade in, the cash down-payment, and the two installments made on the loan, but also general damages compensating Mrs. Hebert for the mental pain and anguish she experienced as a result of the tortious conversion of her property. Therefore, we hold that First Guaranty's argument that it is entitled to off-set its judgment obtained in its reconventional demand for the December 31, 1980 promissory note is without merit. The sixth assignment of error is without merit.

QUANTUM
Defendants argue that "an award of $15,000.00 for general damages in a wrongful seizure or tortious conversion case is simply too high when compared to other similar Louisiana cases."
In Reck v. Stevens, 373 So.2d 498 (La. 1979), the late Justice Albert Tate, Jr., for the Court, reiterated the well-established principle found in the Civil Code that in the assessment of general damages "much discretion must be left to the [trial] judge or jury," citing and characterizing Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) as "the fountainhead decision of modern jurisprudence interpreting and applying this [article 1934(3)] code provision." 373 So.2d at 499. Justice Tate observed in Reck that the Supreme Court had "elaborated on the methodology of appellate review of awards for general damages in Coco v. Winston Industries, Inc.," 341 So.2d 332 (La.1977), and reasoned, in part, as follows:
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive [or inadequate].
....
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much discretion," ... in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive,..., or insufficient, ... Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
373 So.2d at 501. (Brackets, elipsis and emphasis supplied.)
Based on our analysis of the record, we find no abuse of the trial court's "much discretion" in awarding general damages of $15,000.00. We therefore are not required to "resort to prior awards" in determining the question of general damages. Defendants' fifth assignment of error is without merit.
*158 For the foregoing reasons, the judgment of the trial court is affirmed in all respects. Defendants are cast for costs of this appeal.
AFFIRMED.
EDWARDS, J., concurs in the result.
LANIER, J., dissents and assigns reasons.
LANIER, Judge, dissenting.
The majority has changed the duty of a plaintiff to disclose the whereabouts of an absentee defendant to court-appointed counsel. The majority has held that "no limitations were placed on the use of the deposition testimony and defendants' argument that such testimony was for discovery purposes only is self-serving and totally without merit." The facts show this holding is clearly wrong and that the trial court erroneously allowed the Hutchinson and Dinger depositions into evidence. This erroneous admission of evidence interdicted the factual findings of the trial court. Because the factual findings of the trial court were interdicted, the majority has committed error by applying the "manifest errorclearly wrong" standard of review to evaluate the facts, instead of making an independent evaluation of the facts. An independent evaluation of the facts shows the trial court's factual findings are not supported by a preponderance of the evidence. Finally, the $15,000 general damage award for tortious conversion is a gross abuse of discretion.

DUTY OF PLAINTIFF IN SUIT AGAINST AN ABSENTEE TO INFORM COURT-APPOINTED COUNSEL ABOUT RESIDENCE OF ABSENTEE AND OF ABSENTEE'S ATTORNEY
The trial court made the following factual findings:
On September 8, 1981 First Guaranty Bank filed an executory process suit against Louise M. Hebert, asking that a curator be appointed because the whereabouts of Mrs. Hebert were unknown. The bank made no effort to give the curator any information as to the whereabouts of Mrs. Hebert nor did the bank notify the curator that Mrs. Hebert has been represented by Mr. Hobart Pardue, Jr. despite the fact that the bank had received a letter from Mr. Pardue on May 18, 1981 indicating that he did represent Mrs. Hebert.
The majority holds that "we are unable to say that the trial judge was manifestly erroneous in finding that First Guaranty and its employees, including defendant Schafer, improperly withheld information regarding Mrs. Hebert's whereabouts and her representation by Mr. Pardue."
The statement in the reasons for judgment that the First Guaranty Bank (Bank) asked that a curator be appointed because the whereabouts of Mrs. Hebert were unknown is clearly wrong. The pertinent portions of the petition provide as follows:
I.
That the Defendant, LOUISE M. HEBERT, is a person of the full age of majority and is a resident of the County of Hinds, City of Jackson, State of Mississippi.
* * * * * *
Petitioner further prays that an attorney at law be appointed to represent the absentee Defendant upon whom service made be made in a court of law.
The note and chattel mortgage attached to the suit show Mrs. Hebert's address as 185 Grant Street, Ponchatoula, Louisiana. Next to this address on the note is the number 386-4771, which appears to be a telephone number.
Mrs. Hebert was sued as a nonresident absentee. La.C.C.P. art. 5251(1) and (11). Counsel was appointed pursuant to La.C. C.P. art. 5091. Pursuant to La.C.C.P. art. 5094, the court-appointed counsel has a duty to "use reasonable diligence to communicate with the defendant and inform him of the pendency and nature of the action." If court-appointed counsel willfully violates this duty, he may be punished *159 for contempt of court and such further disciplinary action as is provided by law. La.C.C.P. art. 5094 does not impose a duty on the plaintiff or his counsel. A plaintiff and his counsel have a duty not to deliberately withhold information concerning the whereabouts of an absentee from court-appointed counsel. In re Wildeboer, 406 So.2d 687 (La.App. 2nd Cir.1981); Brasher v. Brasher, 372 So.2d 752 (La.App. 4th Cir.1979). A review of the record shows that neither the Bank nor Schafer deliberately withheld information from court-appointed counsel. The record, instead, shows court-appointed counsel failed to use reasonable diligence to locate Mrs. Hebert.
It is inconceivable to me how the majority can say that Schafer "improperly withheld information regarding Mrs. Hebert's whereabouts and her representation by Mr. Pardue." Initially, it should be noted the trial court did not find that Schafer improperly withheld information or counsel's representation; the trial court only found that the Bank did so. Schafer was not the officer who handled the loan with Mrs. Hebert. The loan was made by Charles Morse,[1] who was Manager of the Ponchatoula branch at the time suit was filed. Morse signed the affidavit attached to the petition for executory process. Schafer was transferred from the Ponchatoula branch to the Hammond office of the Bank in April of 1981, before the car came into the possession of the Bank and before the suit was filed. When Schafer received the letter from Mrs. Hebert's attorney, he gave it to one of the Bank's attorneys, Mr. Matheny. However, the suit against Mrs. Hebert was filed by another attorney, Robert W. Tillery. Morse was the Bank officer who turned the matter over to Tillery to file suit. There is not one scintilla of evidence in the record to show that Schafer participated in the preparation or prosecution of the suit against Mrs. Hebert or that he deliberately withheld information of her whereabouts from anyone.
There is no evidence in the record that the Bank deliberately withheld evidence of Mrs. Hebert's whereabouts. The petition asserts she was a resident of Jackson, Mississippi, which was where the Bank last found her prior to suit. The evidence shows that prior to May 7, 1981, Bank personnel attempted to contact Mrs. Hebert at 185 Grant Street in Ponchatoula personally, by mail and by telephone. The Bank also tried to contact her through her attorney, Robert Troyer. All of these efforts were unsuccessful. More importantly, the mortgage documents attached to the petition show the address of 185 Grant Street in Ponchatoula. This address was not withheld, deliberately or otherwise.
The unrebutted testimony of the court-appointed counsel, who was called as a witness by Mrs. Hebert, shows that the only action he took to locate Mrs. Hebert was to place an advertisement in an Amite newspaper. He did not request information from any Bank employee or the attorney who filed the suit about Mrs. Hebert's whereabouts, he made no effort to locate Mrs. Hebert in either Jackson, Mississippi, or Ponchatoula, and he did not examine the note sued upon. Court-appointed counsel did not locate Mrs. Hebert because of lack of diligence, not because information of her whereabouts was deliberately withheld from him.
The implication of the majority holding is obvious. The Bank has been found at fault because it did not affirmatively provide information which was not requested of it. The majority has changed the duty of a plaintiff toward court-appointed counsel from that of not deliberately withholding information to that of affirmatively providing all information at peril of liability (and possible nullity). I am not willing to make such a change in the law and extend it to that extreme.

ADMISSIBILITY OF HUTCHINSON AND DINGER DEPOSITIONS
On December 22, 1983, the Bank and Schafer filed a second set of discovery interrogatories in which they asked Mrs. Hebert, *160 among other things, to "identify every witness you will call or may call to testify at the trial of this matter." This interrogatory was answered on February 22, 1984, with the names of six potential witnesses, including Hutchinson and Dinger.[2]
On September 14, 1984, the Bank and Schafer filed the following notice of depositions on oral examination pursuant to La.C. C.P. arts. 1437 and 1438:
PLEASE TAKE NOTICE that defendant, First Guaranty Bank, will take the depositions of the individuals listed below at the office of the Clerk of Court, Parish of Livingston, Courthouse, Livingston, Louisiana 70754, before a notary public or some officer duly authorized by law to administer oaths, on the date and at the times shown below, as follows:
DEPONENT: Mr. Virgil Hutchinson
DATE AND TIME: Thursday, September 20, 1984, at 10:00 a.m.
DEPONENT: Mr. Alvin Dinger
DATE AND TIME: Thursday, September 20, 1984, at 11:00 a.m.
You are invited to attend, cross-examine, and take part as you deem fit under the circumstances.
In connection with this notice, subpoenas were issued to Dinger and Hutchinson. These subpoenas were served by domiciliary service on September 19, 1984.
Dinger and Hutchinson appeared for their depositions as ordered. At the beginning of each deposition appears the following stipulation (apparently made pursuant to La.C.C.P. art. 1436):
It is stipulated and agreed by and between counsel for the parties hereto that the deposition of VIRGIL HUTCHINSON [ALVIN E. DINGER] is hereby being taken for all purposes, under Article 1421 Et Seq. of the Louisiana Code of Civil Procedure, in accordance with law, pursuant to notice, on Thursday, the 20th day of September, 1984, at the LIVINGSTON PARISH COURTHOUSE, Livingston, Louisiana;
That the formalities such as reading, signing, sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the questions, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence. [Emphasis added.]
At the beginning of his deposition, Hutchinson gave his address as P.O. Box 63, Albany, Louisiana, and his place of employment as Cashio Concrete, 16665 Airline Highway, Baton Rouge, Louisiana. Dinger gave his address as P.O. Box 913, Albany, Louisiana. At page 6 of the Hutchinson deposition appears the following exchange between counsel for the Bank and Hutchinson:
Q Mr. Hutchinson, you're aware that, as I stated earlier, that Mrs. Hebert has sued the bank and Mr. Schafer arising out of a loan given Mrs. Hebert on an automobile, a 1977 Lincoln Continental.
Mr. Pardue, on behalf of Mrs. Hebert, has listed you as a witness to this case and that's why I'm here to take your deposition today to find out what you know about this particular case so that we can be prepared for the trial which is scheduled for next week.
So, I'm going to ask you now a series of questions about the events underlying the suit. I just want to find out what you know about it.
Did you know that you were going to be called as a witness in this case?
A Well, I was notified of it.
Q By whom?
A Louise. [Emphasis added.]
Counsel for Mrs. Hebert asked no questions of either Hutchinson or Dinger in the depositions.
*161 The supplemental record in this case shows that on September 21, 1984, counsel for Mrs. Hebert gave a written request to the Clerk of Court of Tangipahoa Parish for subpoenas for Hutchinson and Dinger (among others) to appear as witnesses at the trial on September 25, 1984. Behind Dinger's name appears "(Hobart served)". This same inscription appears behind the name of Richard Schwartz with an arrow above it pointing to the line on which Hutchinson's name is listed. Subpoenas were issued by the Clerk of Court for Hutchinson and Dinger pursuant to the request on the day they were requested. The request for the subpoenas and the subpoenas themselves do not have the addresses of either Hutchinson or Dinger.[3]
At the trial during the direct examination of Mrs. Hebert, the following occurred:
Q. Let me stop you for just a second. You say your cousin, Virgil Hutchinson, and the other gentlemen was Alvin Dinger?
A. Yes.
MR. PARDUE: I would like at this time to introduce the depositions of Mr. Virgil Hutchinson and Mr. Alvin Dinger, which were taken pursuant to notice and it was stipulated that they were taken for all purposes and I would like at this time to introduce these as number 5 and 6; 5 being the deposition of Dinger and 6 being the deposition of Hutchinson, and the bills for same in the amount of $67.65 each.
MR. HARDIN: Your Honor, we object to the introduction of these depositions on the grounds that they are hearsay testimony. These two men are subject to subpoena within the jurisdiction of this court and the depositions can not be used in place of their live testimony. The fact that they are noticed depositions, they are a discovery device, they are not a substitute for live testimony, unless the witness is outside of the jurisdiction of the court. These men are within the jurisdiction of the court. They were subpoenaed for this deposition. We object to the offering of their depositions, as hearsay testimony and an improper form of testimony.
MR. PARDUE: Your Honor, it was stipulated that they were taken for all purposes, which includes perpetuation. I don't see anyway, based on that stipulation, that these depositions can be excluded.
MR. HARDIN: Taking them for all purposes under Article 1421 of the Louisiana Code of Civil Procedure, Your Honor, does not convert them to trial testimony. It merely means that they can be used at trial if the witness dies, if the witness moves away or if the witness can not be subpoenaed. It does not convert it to trial testimony. They still have to be here testifying live before the court and therefore, the depositions are still hearsay and inadmissible, just as an affidavit is.
MR. PARDUE: Your Honor, I issued subpoenas. I would ask the bailiff at this time to call and check outside and see if they are here.
THE COURT: Call and see if they are here.
MR. HARDIN: Call Virgil Hutchinson and Alvin Dinger.
THE COURT: Please see if they are outside.
MR. HARDIN: Your Honor, the two men ultimately responded to my subpoena to appear for the deposition. Now, whether they were served with the subpoena is a crucial issue and the fact that the plaintiff requested a subpoena is in my humble view, Your Honor, *162 is whether they were actually served and did not appear.
THE COURT: We will have to wait and see if they were served.
BY THE BAILIFF:
No response.
MR. PARDUE: Your Honor, I requested the issuance of these subpoenas at the same time that I had the subpoenas issued for Mr. Morris, Mr. Patel, and the other witnesses and if they weren't servedThe subpoenas were issued timely to everybody and I submit that since it was for all purposes that these depositions should be introduced.
BY THE DY. CLERK OF COURT:
They were issued, but no return is in the record.
THE COURT: The objection is overruled.
The Bank and Schafer contend the depositions are not admissible because Mrs. Hebert failed to show the witnesses were unavailable as required by La.C.C.P. art. 1450 and the facts surrounding the notice and taking of the depositions show they were taken for discovery purposes only and not for perpetuation. Mrs. Hebert responds with the following argument:
The defendants, however, recognize as a result of their own difficulties that these witnesses were, and apparently still are, transient in nature. The record is now complete and clearly indicates the problems associated with getting these witnesses to trial. It is not contested that subpoenas issued. As will appear at page 83 of the trial transcript, subpoenas issued and issued timely. The fact that no return was shown of record at the time is ample proof that the subpoenas could not be served.
Although the reason for the failure to serve the witnesses with the subpoenas is unclear, the predicament facing plaintiff at trial is not. The clear intent of article 1450 of the Code of Civil Procedure is to give any party a fair opportunity to present its case in the face of extraordinary or unexplainable circumstances. Plaintiff is not expected to do more than issue the subpoena, or request the issuance, and provide information reasonably expected to achieve service. No evidence was adduced by defendants at trial to demonstrate that plaintiff failed to do this. Once such evidence apparently came to their attention, defendants had the option to request a new trial based upon this information but failed to do so. Their subsequent efforts to make an attempt to raise the issue without proper resort to a motion for new trial comes too late.
The majority holds that the "joint stipulations of counsel at the depositions, in combination with the notice of depositions, convinces us that no limitations were placed on the use of the deposition testimony." In addition, the majority holds "the trial court had enough live testimony to determine that Mrs. Hebert had proved her case by the required preponderance of evidence, without utilizing any of the deposition testimony," citing Town of Church Point v. Carriere, 463 So.2d 986 (La.App. 3rd Cir. 1985).
A review of the notice of deposition shows it does not state for what purposes the depositions are being taken. Thus, the notice is not relevant to determine the admissibility of the depositions.
The stipulations in the depositions indicate they are being taken "for all purposes, under Article 1421 Et Seq. of the Louisiana Code of Civil Procedure, in accordance with law" and that "all objections ... are hereby reserved until such time as this deposition... may be ... sought to be used in evidence." In Town of Church Point, 463 So.2d at 989, the court found that similar language was ambiguous as follows:
In our opinion Article 1450 of the Code of Civil Procedure governs situations in which there is no stipulation as to the use of a deposition. Here, in taking the deposition of Kirney Thibodeaux, the attorneys stipulated as follows: "As allowed under the Rules of the Louisiana Code of Civil Procedure, it is agreed by all parties that this deposition is being *163 taken for all purposes." This stipulation is ambiguous. Without the introductory clause of the stipulation the "all purposes" provision would seem to permit use of the deposition at trial, saving, of course, any objections from an evidentiary standpoint which would have been valid had the testimony been taken in court as part of the trial. [Emphasis added.]
The language in the instant case is even more ambiguous. To what does "Article 1421 Et Seq." refer? Article 1421 is the first article of Chapter 3, Discovery, of Title III, Production of Evidence, of Book II, Ordinary Proceedings, of the Code of Civil Procedure. However, Chapter 3 is composed of two Sections: Section 1, entitled General Provisions Governing Discovery, composed of Articles 1421 through 1428 and Section 2, entitled Depositions: General Dispositions, composed of Articles 1429 through 1474. Does "Article 1421 Et Seq." refer to only Section 1 (Articles 1421 through 1428) or does it refer to Chapter 3 (Articles 1421 through 1474)? By stipulating that the depositions were "for all purposes... in accordance with law," did the parties intend that the admissibility of the depositions would be controlled by La.C. C.P. art. 1450? Does the fact that the parties reserved objection to the admissibility of the entire deposition until it "may be... sought to be used in evidence" indicate an intent that the admissibility of the entire deposition was controlled by La.C.C.P. art. 1450?
In Town of Church Point, after finding the deposition stipulation was ambiguous, the court looked to the facts surrounding the taking of the deposition to determine the intent of the parties. The court observed that the deposition was taken by the Town of its own expert real estate appraiser and concluded that Carriere's attorney surely must have understood that the Town was taking the deposition for probable use at trial. The opposite is true in the instant case; the Bank and Schafer took the depositions of potential witnesses of their opponent, Mrs. Hebert. Why would the Bank and Schafer want to perpetuate this testimony? If the depositions were taken for perpetuation, why did counsel for Mrs. Hebert decline to ask any questions, why did counsel for Mrs. Hebert subsequently request and have issued subpoenas to compel the attendance of the witnesses at the trial and why did counsel for the Bank and Schafer state he was taking Hutchinson's deposition "so that we can be prepared for the trial which is scheduled for next week"? The facts clearly show the Hutchinson and Dinger depositions were taken for discovery purposes and not for perpetuation. In this factual posture, La.C.C.P. art. 1450 is controlling.
La.C.C.P. art. 1450 provides, in pertinent part, as follows:
At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
* * * * * *
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (a) that the witness is dead; or (b) that the witness is at a greater distance than one hundred miles from the place of trial or hearing, or is out of this state, unless it appears that the absence of the witness was procured by the party offering the deposition; or (c) that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment; or (d) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or (e) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of *164 presenting the testimony of witnesses orally in open court, to allow the deposition to be used. [Emphasis added.]
At the trial, counsel for Mrs. Hebert argued, among other things, that he timely issued subpoenas for Hutchinson and Dinger. The facts of record do not show that a diligent effort was made to obtain the trial attendance of these witnesses. The subpoenas were requested only four days in advance of trial for witnesses residing in another parish and no address was provided on the subpoenas. No evidence was presented to show what efforts were made to secure service of the subpoenas. The witnesses were successfully served for the depositions and therein gave their addresses, with Hutchinson also giving his employment address. Mrs. Hebert has failed to show she was unable to procure the attendance of Hutchinson and Dinger by subpoena.
The depositions were not admissible, and it was prejudicial error for the trial judge to consider them in making his factual rulings.

STANDARD FOR APPELLATE REVIEW OF FACTS
Ordinarily, trial court findings of fact by a judge or jury are reviewed under the manifest error (clearly wrong) standard. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). However, where some legal error (such as improper admission or omission of evidence, erroneous jury instruction or improper jury interrogatory) interdicts the trial court's fact-finding process, the manifest error (clearly wrong) standard is no longer applicable, and the appellate court must make its own independent review of the record and determine a preponderance of the evidence. Suhor v. Gusse, 388 So.2d 755 (La.1980); Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976); Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). The improper admission into evidence of the depositions renders the manifest error rule inapplicable in reviewing this case.

LIABILITY FOR CONVERSION
The tort of conversion is defined as any act of dominion over another's property in denial of or inconsistent with the owner's rights. Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So.2d 756 (La.1985); Holley v. Singletary, 464 So.2d 410 (La. App. 1st Cir.1985). If the owner of the property consents to the defendant's use of the property, no tort has occurred. W. Prosser, Handbook of the Law of Torts, § 18 Consent, pp 101-108 (4th ed. 1971). If a plaintiff consents to a defendant's conduct, there is no legal wrong, and, as such, consent is a defense available to the defendant. F. Stone, 12 Louisiana Civil Law Treatise, Tort Doctrine § 258, pp 349-352 (1977). Cf. Lee v. Lewis, 339 So.2d 513 (La.App. 2nd Cir.1976).
The admissible evidence of record concerning how the Bank obtained possession of Mrs. Hebert's car is found in the testimony of Mrs. Hebert, Schafer and William D. McCormick, Sr. (who was branch manager of the Bank's Ponchatoula branch at the time of trial). A close examination of the testimony of the witnesses is necessary to properly decide this case. Because the majority opinion does not do so, a detailed analysis of the testimony is set forth herein.
Mrs. Hebert testified on May 5, 1981, she was visiting a friend named Maxine in Jackson, Mississippi. On that day, Hutchinson and Dinger came to Jackson to look at a boat that was offered for sale by Maxine's neighbor. While at the neighbor's house, Mrs. Hebert observed Schafer and McCormick drive up to Maxine's house. Mrs. Hebert went back to Maxine's house and invited Schafer and McCormick in. Schafer told Mrs. Hebert he had come to get the car because it was stolen. Schafer also told Mrs. Hebert he was going to call the sheriff. Mrs. Hebert attempted to call her attorney, Robert Troyer, but could not reach him. Mrs. Hebert testified that she threw her car keys down on the coffee table and Schafer took them. She did not give permission to take her car. Mrs. Hebert *165 was afraid she might be arrested. Schafer left with the car, and she passed out. She went back to Ponchatoula the next day and called Schafer at the Bank, but he was not there. She passed by the Bank but did not see her car. Schafer had told her when she got back to Ponchatoula to call him and he would go with her to the car dealership and help her get her old car back. She kept trying to contact Schafer but could not. Nine or ten days after the seizure, she contacted her present attorney about the matter. About six months after her car was taken, she learned it was parked behind Schafer's house. She called her present attorney, told him of the location of the car and asked if she could remove some clothes from the car. Her attorney responded that she could. She went to Schafer's house and got her things from the trunk of the car. At that time, she loaned a book to Schafer.
McCormick testified that on May 7, 1981, he received a telephone call advising him that Mrs. Hebert could be found on Pampas Circle in Jackson, Mississippi. This information was conveyed to Schafer. The Bank was concerned about the security for their loan because the taxes had not been paid on the trade-in vehicle, the State would not issue a title to Mrs. Hebert which, in turn, precluded a valid recordation of the Bank's chattel mortgage, the vehicle was not insured and the vehicle had been taken out of the State. In addition, the Bank had unsuccessfully attempted to contact Mrs. Hebert by telephone, by visits to 185 Grant Street in Ponchatoula and through her attorney, Robert Troyer. Further, Mrs. Hebert was delinquent on a second note. McCormick and Schafer left Ponchatoula in Schafer's car on the afternoon of May 7 to see Mrs. Hebert in Jackson. On arrival in Jackson, the pair went to the front door of the house and knocked on the door. Mrs. Hebert came to the house from the neighbor's yard and invited them in. Schafer explained to Mrs. Hebert the Bank's concerns about the taxes, title and insurance. Mrs. Hebert stated she was concerned about getting the title in her name. She attempted to call her attorney, Robert Troyer, but was unsuccessful. McCormick testified that Mrs. Hebert gave her car keys to Schafer, asked him to bring the car to Ponchatoula and advised that she would come down to the Bank the next day to straighten out the problems. Schafer asked Mrs. Hebert if there was anything in the car she needed, and she responded she had some things in thecar but not to worry because she would be there the next day. During the conversation, Mrs. Hebert was courteous, pleasant and cooperative. Schafer did not talk abusively to Mrs. Hebert, and McCormick did not hear any mention of arrest. Schafer drove Mrs. Hebert's car back to Ponchatoula and parked it in the Bank parking lot next to the police station.
Schafer testified that up until April of 1981, he was manager of the Bank's Ponchatoula branch and was presently the Bank's senior vice-president in charge of marketing. Schafer originally recommended to the loan officer, Charles Morse, that Mrs. Hebert get the loan in view of her past history with the Bank. After the problems of taxes and title developed, Schafer attempted to contact Mrs. Hebert personally and through her attorney, Robert Troyer, and had been unsuccessful. On May 7, 1981, he received a call from McCormick indicating that Mrs. Hebert could be found in Jackson, Mississippi. Schafer and McCormick left Ponchatoula at about 3:00 p.m. in Schafer's car. They arrived at the Jackson address and observed Mrs. Hebert's car parked on the side of the residence. Schafer and McCormick went up to knock on the door, and Mrs. Hebert came up behind them from next door. After looking at the car, Mrs. Hebert invited Schafer and McCormick into the house. Schafer explained the tax, title and insurance problems to Mrs. Hebert. Schafer asked Mrs. Hebert to return the car to Ponchatoula so a new bill of sale could be obtained from the dealer and a new application for title could be made. Schafer asked Mrs. Hebert to return to Ponchatoula with him and he would drive her car. She replied she could not go that day but could go *166 the next day. Schafer then gave the following testimony:
I said, Louise, well, I can't wait `till tomorrow. I said, and if you don't show up as a result of my thoughts about whether she would respond to coming down, I said, my only alternative would be to put out a formal seizure on the car, because it is in Mississippi, we didn't know you were up here and only by this phone call did we locate you. I said, I'll have to turn it over to the attorney and the process then would be for the sheriff in this county to seize the car. Mrs. Hebert's response to that, she didn't want that to happen. I said, well, we don't want that to happen either. This is a long drawn out process, certainly not in either of our benefits. About that time, she wanted to call Troyer and she attempted to call Mr. Troyer and I encouraged her to try to call Mr. Troyer and she couldn't get in contact with him and again, I tried to encourage her to come on and go and she said no, I'll come tomorrow, I'll come tomorrow, I have some friends coming down. We didn't attempt to find out who the friends were, but they will bring me and I said, well, Louise, I will be glad to drive the car back and put it on the lot and you can come to the office and straighten out the title problems and we will see about getting some insurance on your car and she said that would be fine and she went to her purse and got her keys, her keys was on a plastic holder with Louise written on it, and she took it off the ring and gave me just the key to the ignition to the car. I said, Louise, do you have anything in the car that you need and she said no, because she would be there tomorrow to get it anyway, nothing she needed in the car.
Schafer drove the car back to Ponchatoula and parked it in the Bank parking lot next to the police station. Schafer received no call or message from Mrs. Hebert the next day. The next communication that Schafer received concerning Mrs. Hebert's car was a letter dated May 18, 1981, from her present attorney which provided as follows:
I have been contacted by Ms. Louise M. Hebert who advises me that you seized her vehicle in the State of Mississippi and took it without authorization from her premises.
Please contact me or have your attorney contact me in an attempt to settle this dispute over this illegal seizure.
Schafer called the attorney and advised him the car was not seized, he was doing a favor for Mrs. Hebert in trying to correct the deficiencies in her title and he had heard nothing from Mrs. Hebert. Schafer then turned the letter over to the Bank's attorney, Mr. Matheny. Several weeks after the car was put in the Bank parking lot, it was transferred to the rear of Schafer's house. In about August of 1981, Mrs. Hebert went to Schafer's house to get her personal belongings out of the car. Mrs. Hebert opened the trunk of the car with a key she had and took her things. This was the last communication Schafer had with Mrs. Hebert.
Mrs. Hebert's credibility was destroyed by her psychiatrist, Dr. Richard P. Strobach, and her family doctor, Dr. Merlin H. Allen. Dr. Strobach commenced treating Mrs. Hebert in 1978. At that time, she was taking Nolvane, an antipsychotic medication, and had a history of alcohol abuse and diabetes. Mrs. Hebert "was not a very faithful patient in terms of keeping her appointments." On Christmas Eve of 1979, she called Dr. Strobach in an intoxicated condition "and said that she was going to consume a bottle of Jack Daniels and take a bottle of Valium and kill herself." Dr. Strobach pleaded with her not to do that and to contact him the next day. She did not. Dr. Strobach next saw Mrs. Hebert on February 22, 1980. She complained that her daughter had had her picked up and evaluated by the coroner and she wanted to know what had happened to her. She expressed a great deal of anger at her children and advised him her husband was dying of cancer, which caused her severe stress and anguish. On February 27, 1980, Dr. Strobach consulted with Mrs. Hebert's three daughters. Her daughters reported *167 that Mrs. Hebert did not give Mr. Hebert his food or pain medication, and they accused her of taking the medication herself. Dr. Strobach advised the daughters of Mrs. Hebert's diagnosis and condition. The daughters agreed to resolve their problems with Mrs. Hebert under the following terms: (1) the daughters could visit Mr. Hebert twice a day; (2) the daughters would give Mr. Hebert his food and medication; (3) one daughter would go with Mrs. Hebert to bring Mr. Hebert to his doctor for treatment; and (4) Mrs. Hebert would have weekly sessions with Dr. Strobach. On February 29, 1980, Mrs. Hebert returned to see Dr. Strobach. He advised her of her daughters' terms, and she agreed to them. Dr. Strobach never saw her again. Dr. Strobach gave the following description of Mrs. Hebert's mental condition:
Q. Would you give the court that diagnosis, please?
A. I feel it is two-fold. One, that she suffers from a character disorder with very strong hysterical and antisocial or sociopathic traits and also chronic alcohol and other drug abuse.
Q. Would you explain for me, please, what sociopathic means in Mrs. Hebert's context?
A. It's perhaps better that I explain what a character disorder is. It's a type of personality, a type of character one develops at a very early age and relates to the world that way and it remains unchanged and in her case, sociopathy means manipulative, not following the rules of society, following her own rules, her own attitude. Hysterical meaning very emotional, very dramatic.
Q. As part of that character disorder, can you describe in Mrs. Hebert's context, the way a person conducts herself in the context of that character disorder, in relation to other people?
A. In a very self-centered fashion, because their attitudes are governed by how they perceive the world and want to relate to the world, not how society has dictated they should relate to the world. Therefore, with her character traits, she would be very manipulative or dramatic, very conniving, plotting, overly exaggerating symptoms or complaints, abusing drugs or alcohol because those would be rules she wouldn't follow.
Q. Does a sociopath have moral precepts, sir?
A. That's the cardinal feature of the illness, that they lack the ability to feel guilty and feel fear as well.
Dr. Allen was Mrs. Hebert's family doctor from September 28, 1968, until June of 1980. Her initial problem was diabetes mellitus. In the mid 1970's, Dr. Allen observed that Mrs. Hebert was suffering from anxiety and severe depression. Dr. Allen then found that Mrs. Hebert was having problems with drinking alcohol and taking her antidepressant medications. In 1976 or 1977, he suggested she seek psychiatric help. Dr. Allen described Mrs. Hebert's condition as a manic depressive character disorder. Her condition got worse until in June of 1980 she was admitted to the Seventh Ward Hospital and was very sick mentally at that time. She was diagnosed as having a severe anxiety neurosis. Mrs. Hebert did not diet properly and did not properly take her insulin and had several episodes of being in insulin shock. Dr. Allen then testified as follows:
Q. Based on your medical course of treatment with her, was she a trustworthy and honest patient?
A. Well, it's my dealings with Louise in the late '70s that I would have to say that in many cases she was not honest with me and she was not honest with Stanley and by this, I mean that prescriptions were prescribed for Stanley and Louise would pick them up, and this was when she was having some of her greatest problems with her mental condition in that she would not give the medication *168 to Stanley and this is unfortunate.
Q. What was Stanley's condition at that time?
A. Well, Stanley, in the late '70s was a very terminally, seriously ill man Well, let's put it this way. He had cancer and then the treatments for the cancer did not seemingly take affect and so, as a result, you know, he died of the cancer of the lung.
Q. What kind of medication that we are referring to here at this point?
A. The medicines that were given to Stanley were Mepergan Fortis, which is a Demerol-Phenegran combination, Percodan. These were all oral pain medications.
Q. And what was the purpose of giving Stanley pain medication?
A. Well, the cancer that he had had caused a lot of terrific pain. He had eroded into the rib cage and he had constant agonizing pain and at first, as you know, we try to administer just pain medication by mouth and then later, obviously, Stanley was on Dilaudid and Morphine by injection.
Q. Did it come to your attention that Stanley was not getting this medicine?
A. Oh, yes.
Q. Who was taking it?
A. Louise. I have to admit I have no personal exact knowledge. I didn't do a blood level on Louise, but she would pick up the prescription and would never get to Stanley. Now, in reality, I did not see Louise take the medication. I only can assume that in December and the winter of 1979 that it was called to my attention by the pharmacist that Mr. Hebert was wanting his medicines refilled before, you know, the normal time and in searching their records and so forth, they said that Louise had picked up the medicine. This was told to me. From then on out, I had to give the prescriptions to the girls and they would pick it up, her daughter, Stanley Lynn, and they would take them to Stanley.
In rebuttal, Mrs. Hebert testified she did not have a drinking problem during the last two years of her husband's life, she did occasionally have a drink, she was very upset about her husband's pending death, she did not take her husband's prescription drugs, she had not seen the doctors since her husband's death in 1980 and has not abused drugs or alcohol from that time until the present.
Various portions of Mrs. Hebert's total testimony is contradicted by Schafer, McCormick, Dr. Strobach and Dr. Allen.
The preponderance of the admissible evidence shows that Mrs. Hebert voluntarily consented to allow Schafer to take her car and bring it to Ponchatoula. In this factual posture, there is no unlawful conversion and the majority opinion affirming the ruling of the trial court is clearly wrong.

QUANTUM
The trial court found "Mrs. Hebert is entitled to $15,000.00 for the mental anguish and distress she suffered as a result of illegal seizure." The majority holds this is not an abuse of discretion. Neither the facts nor the jurisprudence support such an award for nonpecuniary damages for tortious conversion.
Dr. Strobach testified about the effect of the seizure on Mrs. Hebert as follows:
Q. Doctor, without examining Mrs. Hebert again, can you give an opinion with a reasonable degree of medical certainty whether an incident in which she may have been required to involuntarily relinquish her automobile to Mr. Schafer, would have aggravated any of her underlying or preexisting psychiatric or personality disorders?
A. For the reason I said before, I would have to say. Character disorders do not change. They live in emotional turmoil, whether there is good times or bad times.

*169 Q. So, with the events that I have described, have any impact on the underlying psychiatric condition of this lady?
A. I would have to say no.
Dr. Allen testified about the effect of the seizure on Mrs. Hebert as follows:
BY MR. PARDUE:
Q. Doctor, based on that, that she would get even so to speak, if somebody did her something, do you feel that if somebody did her something or she assumed that they did her something and in this case, took her car away from her, she would have been upset at that time?
A. Well, I'm sure that, you know, anybody that, you knowI mean, all of us have a conscious and a mind and I'm sure that it did upset her to some degree at that time, somebody comes and picks up the car because of whatever reason, failure to pay the note or something, but I feel with Louise's personality this would not be aIn other words, she may have the reds at that time and she may be upset, but I really don't think that this thing would really bother her that much, Hobart.
Based on this evidence, the $15,000 award is an abuse of discretion, and the jurisprudence must be consulted to see what is the highest amount that reasonably could have been given.
In Holley v. Singletary, 464 So.2d at 414, the author of the majority opinion herein discussed what was an appropriate award for general damages in the conversion of a $2,500 boat as follows:
Finally, defendant argues that the award of $1,250 in general damages is excessive. After reviewing the circumstances urged by defendant as justifying a decrease in this award, we are of the opinion that the trial court's award for embarrassment and inconvenience, while perhaps at outer limits, is not manifestly excessive. [Emphasis added.]
In Theriac v. McKeever, 405 So.2d 354, 359 (La.App. 2nd Cir.1981), appears the following:
General damage awards for the conversion of a vehicle range from $100 to $1000 in the following decisionsHamilton v. Travelers Indemnity Company, supra [248 So.2d 617 (La.App.3d Cir. 1971)]; Lee v. Lewis, 339 So.2d 513 (La. App.2d Cir.1976); Brian v. Wilson, 81 So.2d 145 (La.App.2d Cir.1955); Steadman v. Action Finance Corporation, 197 So.2d 424 (La.App.2d Cir.1967); Tarver v. Tarver, supra [242 So.2d 374 (La. App.2d Cir.1970)]. In view of the fact that the truck was not taken from plaintiff's immediate possession, and that the conversion was not done in any especially ostentatious way, we find that an award of $750 in general damages will adequately compensate plaintiff.
Other general damage quantum cases involving automobiles and trucks are (1) Hernandez v. Harson, 237 La. 389, 111 So.2d 320 (1958)$1,000; and (2) Navratil v. Smart, 400 So.2d 268 (La.App. 1st Cir. 1981), writ denied, 405 So.2d 320 (La.1981) $500. Considering all of the above and the facts of this case, the maximum award for general damages that reasonably could be given is $1,000.
For the foregoing reasons, I dissent.
NOTES
[1] In the transcript, Morse's name is misspelled as Morris.
[2] The majority opinion states that "we are not aware of any formal pretrial procedure in existence in the district court of Tangipahoa Parish at the time litigation was running its course." Rules X, XI and XII of the Court Rules of the Twenty-First Judicial District Court for Tangipahoa Parish, effective January 1, 1984, provide for the method of obtaining a pretrial conference. See West's, Louisiana Rules of Court, pp 358-360 (1986).
[3] Attached to the defendants' supplemental brief is an affidavit from a Deputy Clerk of Court for Tangipahoa Parish which indicates she is responsible for the issuance of subpoenas in the Civil Department of the Tangipahoa Clerk of Court's Office, that the trial subpoenas for Dinger and Hutchinson were issued on September 21, 1984, at the request of counsel for Mrs. Hebert and that counsel for Mrs. Hebert took the subpoenas for Hutchinson and Dinger himself. Affidavits attached to a brief are not part of the record on appeal and cannot be considered. Chapa v. Chapa, 471 So.2d 986 (La. App. 1st Cir.1985).